TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARIA JHAI (Cal. Bar No. 283059)
KATHRYNNE SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorneys
General Crimes
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4138/0631
    Facsimile: (213) 894-0141
    E-mail:    maria.jhai@usdoj.gov
               kathrynne.seiden@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>EDWIN OLIVA,<br><br>            Defendant. | No. CR 19-00161-AB<br><br>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT EDWIN OLIVA EXHIBITS<br><br>Hearing Date: January 7, 2022<br>Hearing Time: 1:30 P.M. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Maria Jhai and Kathrynne Seiden, hereby files its sentencing position regarding defendant Edwin Oliva ("defendant").

This position is based upon the attached memorandum of points and authorities and exhibits 1-6 attached hereto, exhibit 7 (to be filed under seal), the files and records in this case, the Presentence Report ("PSR") disclosed by the United States Probation and Pretrial Service Office ("USPO") on December 3, 2021, (docket

number ("Dkt.") 88), the USPO's December 3, 2021, sentence recommendation letter (Dkt. 87), and such further evidence and argument as the Court may wish to consider at the time of sentencing.

The government reserves its right to file any response to defendant's sentencing position, if necessary.

Dated: December 24, 2021          Respectfully submitted,

                                  TRACY L. WILKISON
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                        /s/ Maria Jhai
                                  MARIA JHAI
                                  KATHRYNNE SEIDEN
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Defendant Edwin Oliva ("defendant") is a drug dealer who gave a lethal quantity of fentanyl to victim B.M., knowing that it was fentanyl but representing that it was cocaine.  When B.M. was thereafter rendered unconscious--and possibly had already died--defendant filmed himself raping her inert body while she lay unmoving, face down on his bed.  Defendant then posted the rape videos to Snapchat.

Although defendant knew that B.M. was unconscious or already dead, defendant then spent several hours attempting to cover his tracks, hiding B.M.'s possessions and evidence of his drug distribution--including almost two kilograms of heroin, other drugs, a firearm, a digital scale, nitrile gloves, and other distribution paraphernalia--in his girlfriend's car.  Defendant did not seek medical help for B.M. until after 8:00 am the next morning when it was far too late to help her.  Even then, defendant only called 911 and hung up.  When the police did arrive, and over the course of several interviews, defendant lied repeatedly about his conduct the night before.  Rather than show remorse, or respect, for the victim, defendant bragged about the sexual positions he claimed they had used and called her "a freak" in bed.  From prison, defendant called his girlfriend and instructed her to lie to police and to destroy the evidence of his drug trafficking that he left in her car, including a notebook and blue flip phone that held a record of his drug sales and communications with his drug customers.

In sum, defendant knowingly gave B.M. the line of fentanyl that killed her, sexually violated her dead or unconscious body, and in

1

the aftermath of these acts, demonstrated only a hardened instinct for self-preservation.  Not remorse.  Not compassion.  Not understanding of the nature of his conduct or the value of the victim's life.  The consequences for the victim and her family are devastating and irreversible.

Defendant was charged in a four-count first superseding indictment (the "indictment") with distribution of fentanyl resulting in death (count one), possession with intent to distribute heroin (count two), possession with intent to distribute fentanyl (count three), and carrying and possessing a firearm in furtherance of a drug trafficking crime (count four).  (Dkt. 37.)  On September 10, 2021, defendant pleaded guilty pursuant to a plea agreement to counts one and two. (Dkt. 85 ("Plea Ag.").)

As explained herein, the government disagrees with the total offense level calculated by the USPO.  Applying the applicable sentencing factors, defendant's guidelines range is life in prison based on a total offense level of 43 and criminal history category I.  The government recommends that the Court sentence defendant to 420 months' imprisonment—-a 35-year sentence-—followed by five years of supervised release.

## II.   FACTUAL BACKGROUND

Defendant gave B.M. the fentanyl that caused her death in the early morning of February 28, 2019.

### A.   DEFENDANT AND B.M. PLAN TO MEET

Defendant and B.M. met for the first time on the evening of February 27, 2019. (PSR ¶ 10; Plea Ag. ¶ 19.)  A mutual friend,

M.B.,[1] introduced defendant to B.M. as someone who could sell B.M. cocaine.  (PSR ¶ 10; Plea Ag. ¶ 19.)   Text message communications between defendant, B.M., and M.B. create a chronology of the night. (See PSR ¶¶ 10-17; Plea Ag. ¶ 19.)

Starting at about 6:00 pm, defendant, M.B. and B.M. texted about plans to meet up in Hollywood after B.M. got off work. (Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002613-2615.)[2]  At about 10:03 pm, B.M. canceled, saying she did not have a ride from Santa Clarita, where she was working, to Hollywood.  (PSR ¶ 12; Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002613.)  B.M. explained to defendant that she did not have gas money and that she would need not only a ride to Hollywood but then a ride back to Lancaster after any meet up.  (Ex. 1 at USAO_OLIVA_002611.)  Defendant offered to pick her up and drive her to Hollywood where, B.M. expected, they would meet her friend M.B.  (PSR ¶ 12; Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002612-2613)

---

[1] M.B. also goes by a nickname starting with "T" and is referred to in text messages and reports of investigation by that name.

[2] Exhibits 1 and 3 are true and correct copies of excerpts of reports from B.M.'s and defendant's cell phones, respectively, showing text messages on February 27 and 28, 2019. Unredacted versions of the exhibits were produced in discovery.  The text messages have been redacted for relevance and privacy for this filing, including to exclude text messages between persons other than defendant, B.M., M.B., and defendant's texts with his brother. Page number citations are the bates numbers used in production. Time stamps for the text messages in Ex. 1 are in Pacific Standard Time ("PST").  Time stamps for the text messages in Ex. 3 are in Coordinated Universal Time ("UTC"), which is converted to PST by subtracting 8 hours.  Messages in Ex. 1 display in reverse chronological order; messages in Ex. 3 display in chronological order.

### B.   DEFENDANT TAKES B.M. TO HIS HOUSE WITHOUT TELLING HER AND SHE FEELS UNSAFE

Defendant picked up B.M. but did not take her to Hollywood or to meet up with M.B. as B.M. expected.  Instead, defendant drove B.M. approximately 40 miles to his home in Montebello, about 16 miles past Hollywood.  (PSR ¶¶ 13-14; Plea Ag. ¶ 19; Ex. 2.)[3]  In text messages to her friend during the ride, B.M. indicated that she did not know where defendant was taking her, did not know where she was, and did not feel safe with defendant:

| FROM | TO | CONTENT | TIME |
|------|------|---------|------|
| B.M. | M.B. | [M.B.] I'm way past L.A. what's going on? | 11:48 pm |
| M.B. | B.M. | I thought u guys goin to Hollywood? | 11:48 pm |
| M.B. | B.M. | Did u ask him if where u guys gonna go?? | 11:49 pm |
| M.B. | B.M. | He told me his gonna give u the coke tho that's it | 11:49 pm |
| B.M. | M.B. | That's what I thought. No I thought we were meeting | 11:49 pm |
| B.M. | M.B. | You | 11:49 pm |
| B.M. | M.B. | Idk where we are please call him | 11:49 pm |
| M.B. | B.M. | I'm calling him rn | 11:51 pm |

---

[3] Exhibit 2 is a pdf of maps showing the distance from B.M.'s work to Hollywood, and from Hollywood to defendant's residence in Montebello, California. The maps were produced to defense counsel concurrently with this filing.

4

| FROM | TO | CONTENT | TIME |
|------|-----|---------|------|
| M.B. | B.M. | He didn't pick up he said his busy | 11:51 pm |
| B.M. | M.B. | Call him again please I don't feel safe | 11:51 pm |
| M.B. | B.M. | Tell him to answer the phone | 11:52 pm |
| M.B. | B.M. | His stupid I thought u guys goin to Hollywood and I will meet u over there | 11:52 pm |
| M.B. | B.M. | Just tell him if he can drop u off at my house and give the coke | 11:53 pm |
| M.B. | B.M. | He don't pick up again I called him a lot | 11:53 pm |
| M.B. | B.M. | Bri u ok? | 11:54 pm |

(PSR ¶ 13; Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002608-2609.)

By 11:57 pm, defendant and B.M. arrived at a Vons supermarket in Montebello, California.  B.M. texted her friend:

| FROM | TO | CONTENT | TIME |
|------|-----|---------|------|
| B.M. | M.B. | I'm in a bathroom at vons right now but idk what city we are and I don't wana be alone with him anymore | 11:57pm |

(PSR ¶ 13; Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002608.)

M.B. texted defendant to let him know that B.M. was scared.
(Ex. 3 at USAO_OLIVA_002643.)  Defendant asked M.B. to lie to B.M.

5

and say that M.B. planned to meet up with them at defendant's house. (<u>Id.</u>)  B.M. identified this as a lie, texting her friend:

| FROM | TO | CONTENT | TIME |
|------|------|---------|------|
| B.M. | M.B. | He's lying | 12:03 am |
| B.M. | M.B. | He keeps lying to me | 12:03 am |
| M.B. | B.M. | What did u told u? | 12:03 am |
| M.B. | B.M. | Wya?? U at the car? | 12:04 am |
| B.M. | M.B. | That you were meet us at his house | 12:04 am |

(Ex. 1 at USAO_OLIVA_002607.)

### C. DEFENDANT GIVES B.M. A LINE OF FENTANYL THAT SHE BELIEVES IS COCAINE

About ten minutes later, at 12:16 am, B.M. texted M.B. that B.M. and defendant had arrived at defendant's apartment.  (PSR ¶ 14; Ex. 1 at USAO_OLIVA_002606.)  She followed this text moments later with a text stating, "I don't wana stay I wana see you but he's not gona let me leave." (PSR ¶ 14; Plea Ag. ¶ 19.)

As they arrived at the house, defendant told B.M. that he did not in fact have any cocaine, as he had promised, but rather he had given it to a friend earlier.  (PSR ¶ 14; Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002606.)  Shortly afterwards, however, defendant gave B.M. a line of what B.M. believed was cocaine, but in fact was the fatal line of fentanyl.  At 12:23 am, B.M. messaged her friend:

| FROM | TO | CONTENT | TIME |
|------|------|---------|------|
| B.M. | M.B. | He just gave me a line and I don't think it's coke | 12:23 am |

6

| B.M. | M.B. | I thinks he just drugged me with something bad and he's gona rape me [M.B.] | 12:24 am |
|------|------|------|------|
| M.B. | B.M. | Did u take it?? | 12:24 am |
| B.M. | M.B. | Yes I thought it was coke bit it's not | 12:25 am |

(PSR ¶ 15; Plea Ag. ¶ 19; Ex. 1 at USAO_OLIVA_002605.)  "Yes I thought it was coke bit it's not" is the final text message from B.M.'s phone.  Two minutes later, M.B. texted B.M. again asking: "How u feel?"  (Ex. 1 at USAO_OLIVA_002605.)  B.M. never responded. Id.

    **D.   DEFENDANT SEXUALLY VIOLATES B.M.'S INERT BODY**

    At about 1:14 am, about 50 minutes after B.M.'s final text message, defendant used his iPhone to record himself performing penetrative sex acts on B.M.'s dead or unconscious body.  (PSR ¶ 16; Ex. 7; see also Plea Ag. ¶ 19.[4])  Defendant recorded four videos spanning six minutes showing himself penetrating B.M.'s vagina and anus with his penis. (PSR ¶ 16; Plea Ag. ¶ 19.)  B.M.'s body is motionless and non-responsive throughout; she does not move, respond, or make a sound.  (PSR ¶ 16; Ex. 7.)  B.M.'s left hand is tucked underneath her body and is a reddish-purple color, consistent with a lack of circulation.  (PSR ¶ 16; Ex. 7; Ex. 4 at

---

[4]  Redacted copies of the videos defendant recorded will be filed in a separate under-seal filing as Exhibit 7 to this sentencing position. The videos were produced under Bates number USAO_OLIVA_000461.

USAO_OLIVA_000028.)[5]  She is lying face down, with no hands or other positioning to keep her face from pressing into the mattress.  (PSR ¶ 16; Ex. 7; Ex. 4 at USAO_OLIVA_000028.)  Defendant did not wear a condom.  (PSR ¶ 16; Ex. 7.)  Afterward, defendant shared the videos in a Snapchat story.  (PSR ¶ 16.)

### E.  DEFENDANT KNOWS B.M. IS "NOT BREATHING" AND DOES NOTHING TO HELP HER

Defendant's text messages confirm that defendant understood B.M. was either unconscious or dead nearly six hours before he called the police or sought medical attention.  At 2:22 am, defendant texted M.B.: "You're friend fell asleep." (PSR ¶ 17; Plea Ag. ¶ 19; Ex. 3 at USAO_OLIVA_002644.)  Two minutes later, he wrote:

| FROM | TO | CONTENT | TIME |
|------|-----|---------|------|
| Defendant | M.B. | I'm just scared that she not breathing does she do this often | 2:24 am |

(PSR ¶ 17; Plea Ag. ¶ 19.)

Defendant and M.B. then spoke on the phone.  (PSR ¶ 18; Plea Ag. ¶ 19.)  M.B. told defendant to call 911.  (PSR ¶ 18; Plea Ag. ¶ 19.) Defendant did not do so until almost six hours later. (PSR ¶ 18; Plea Ag. ¶ 19.)  Finally, at 8:06 a.m., defendant called 911, but he hung up without reporting what happened.  (PSR ¶ 18; Plea Ag. ¶ 19.) Rather, he reported B.M.'s death only after 911 called him back.  (PSR ¶ 18; Plea Ag. ¶ 19.)  Paramedics arrived almost immediately and pronounced B.M. dead upon arrival.  (PSR ¶ 19; Plea

---

[5] Exhibit 4 is a true and correct copy of certain investigative reports produced in discovery in this case.

Ag. ¶ 19.)  As the Los Angeles County Medical Examiner-Coroner determined, B.M. had both alcohol and fentanyl in her system, but the alcohol was not present in sufficient quantities to have caused her death on its own. (PSR ¶ 19; Plea Ag. ¶ 19.)  Thus, B.M. would not have died if defendant had not given her fentanyl, making the fentanyl that defendant gave B.M. the but-for cause of her death. (PSR ¶ 19; Plea Ag. ¶ 19.)

### F.   DEFENDANT HIDES B.M.'S POSSESSIONS AND EVIDENCE OF DRUG TRAFFICKING

During the nearly six hours after defendant texted M.B. that B.M. was "not breathing" and before he called 911, defendant cleared his house of B.M.'s possessions and evidence of his drug trafficking.  (PSR ¶ 20; Plea Ag. ¶ 19.)  Defendant collected and removed items from his apartment and put them in the trunk of his girlfriend's Toyota Camry, which he then moved and parked a short distance away from his house to hide it from law enforcement.  (PSR ¶¶ 20; Plea Ag. ¶ 19.)

The drugs and drug paraphernalia defendant hid in the trunk of his girlfriend's car included: 1.895 kilograms of heroin, 21 grams of fentanyl, 1.43 kilograms of marijuana, .36 grams of methamphetamine, plastic baggies, rubber gloves, and masks, a digital scale, and utility knife replacement blades. (PSR ¶ 21; Plea Ag. ¶ 19.)  In a cardboard box, mixed in with the drugs and drug paraphernalia, defendant also hid a loaded Smith & Wesson model M&P 45 Shield, .45 caliber semiautomatic pistol.  (PSR ¶ 21; Plea Ag. ¶ 19.)  There was more evidence of drug trafficking in the passenger compartment of the car, including a blue Alcatel flip phone and a notebook that defendant used as a pay/owe ledger. (PSR ¶ 23; Plea

Ag. ¶ 19.)  Messages in the phone documented defendant's drug deals, including text messages from customers using coded language to ask to buy drugs.  (PSR ¶ 23; Plea Ag. ¶ 19; Ex. 4 at USAO_OLIVA_000037.)  The pay/owe ledger included a list of customers followed by dates, narcotics, quantities, amount paid, and amount owed for various narcotics identified as "Black," "Clear," "Fety," "Glass," "Chyna," and "Chyna White."  Customers identified in the ledger are the same as those in the blue flip phone, including, e.g., "Chicago." (PSR ¶ 23; Plea Ag. ¶ 19; Ex. 5.)[6]

Defendant also hid B.M.'s purse and cellphone in the trunk of his girlfriend's car.  (Ex. 4 at USAO_OLIVA_000007, _000033.)  A surveillance camera showed defendant moving B.M.'s purse into the trunk of the car at about 8:00 am, shortly before he called the police.  (Ex. 4 at USAO_OLIVA_000007-8.)

**G.   DEFENDANT LIES TO POLICE**

Defendant then lied repeatedly in interviews with police on the day of B.M.'s death.  (PSR ¶¶ 31-40.)  His lies included the following:

- Defendant claimed repeatedly that he used his brother's car to pick up B.M. (not his girlfriend's car, which he had hidden on a nearby street).  (PSR ¶¶ 32, 34.)  He recanted this lie only after his girlfriend--who came to his house looking for him--told police that defendant had her Toyota Camry, and police thereafter found it where defendant had tried to hide it.  (PSR ¶ 34.)  Even after the car was discovered, defendant claimed he did not have the

_____

[6] Exhibit 5 is a true and correct copy of excerpts of the photocopies of the notebook recovered from the Toyota Camry that was produced in discovery in this case.

10

keys to the car.  The keys were later found in his pocket.  (PSR ¶ 39; Ex. 4 at USAO_OLIVA_000036.)

- At thought she snorted cocaine that she brought for herself.  (PSR ¶ 32.)  Hours later he admitted that he gave her fentanyl.  (PSR ¶ 37.)

- Defendant also lied--and bragged--about having consensual sex with B.M., telling officers that he has a "good physique" and that B.M. "came onto him."  (PSR ¶ 32.)  Defendant described multiple sexual positions he claimed they had used.  (PSR ¶ 32; see also Ex. 4 at USAO_OLIVA_000026-27.)  Defendant described B.M. as a "freak" in bed and claimed that she was "into" it.  (PSR ¶ 35; Ex. 4 at USAO_OLIVA_000030.)  He denied that she was passed out while they were having sex and claimed that she was 'moaning the whole time . . . as if she is awake and aware."  (PSR ¶ 35; Ex. 4 at USAO_OLIVA_000031.)  When confronted with the videos on his phone, defendant admitted that she was probably "knocked out" at that point.  (PSR ¶ 3; Ex. 4 at USAO_OLIVA_000031.)  Defendant claimed that he was "too intoxicated" to remember, although a blood alcohol test taken by police the next morning showed no trace of alcohol in his system. (PSR ¶ 35; Ex. 4 at USAO_OLIVA_000025; see also USAO_OLIVA_000037.)

- Defendant claimed that he was not aware that B.M. was not breathing until he returned from a morning run.  (PSR ¶¶ 32, 36.)  When confronted with his text to M.B. about B.M. "not breathing," he said he did not remember it.  (PSR ¶ 36.)  Sometime between the time he sent the message and the time officers arrived to investigate, defendant erased the text messages from his phone.  (PSR ¶ 32.)

11

1       •   Defendant told officers that B.M. did not have a purse

2 with her and claimed to not know where her cellphone was.  (Ex. 4 at

3 USAO_OLIVA_000026, _000031-32, _000034.)  B.M.'s text messages

4 establish that she was using her cellphone throughout the night,

5 including after she arrived at defendant's apartment.  Her cellphone

6 and purse were recovered from the trunk of defendant's girlfriend's

7 car. (Ex. 4 at USAO_OLIVA_000033.)  As discussed above, defendant

8 was captured on surveillance video placing the purse in the trunk

9 shortly before calling 911.  (Id. at USAO_OLIVA_000037.)

10      **H.   DEFENDANT TELLS HIS GIRLFRIEND TO DESTROY EVIDENCE**

11      Several days after his arrest, on March 5, 2019, defendant

12 called his girlfriend from prison and directed her to destroy

13 evidence of his drug trafficking and to lie to police.

14 Specifically, defendant told his girlfriend to tell police that the

15 blue Alcatel phone that defendant used to set up drug deals was a

16 "play phone" for their children.  (PSR ¶ 24; Plea Ag. ¶ 19.)  He

17 told her to destroy the phone when she got the car out of impound,

18 to "break it, throw it, whatever," and to "burn" the notebook

19 containing his pay/owe ledger.  (PSR ¶ 24; Plea Ag. ¶ 19.)

20 **III.  SENTENCING GUIDELINES CALCULATIONS**

21      As explained herein, defendant's total offense level is 43, not

22 39 as calculated by the USPO.  Accordingly, defendant's guidelines

23 sentence is life in prison.

24      First, the government agrees with the USPO's calculation of

25 defendant's base offense level and application of adjustments for

26 possession of the Smith & Wesson firearm and for obstruction of

27 justice.  Specifically, as set forth in the PSR and stipulated in

28 the plea agreement, under USSG § 2D1.1(a)(2), defendant's base

offense level is 38 because death resulted from defendant's distribution of fentanyl to the victim; under USSG § 2D1.1(b)(1), a two-level increase applies because defendant possessed a firearm-- the loaded Smith & Wesson M&P 45 Shield handgun that he tried to hide in his girlfriend's car--in connection with the offense; and under USSG § 3C1.1, an additional two level increase applies because defendant obstructed the investigation of his crimes by trying to hide evidence and repeatedly lying to police, and by telling his girlfriend to lie to police and to destroy evidence of his drug dealing (PSR ¶ 51). The parties stipulated to the base offense level and the two-level increase for obstruction of justice in the plea agreement. Without more, defendant's total offense level, after credit for acceptance of responsibility, would be 39 as calculated by USPO.

Here, however, an additional four-level increase applies, bringing defendant's total offense level to 43, because when defendant gave B.M. the fentanyl, he knowingly misrepresented it as another substance. See USSG § 2D1.1(b)(13). As reflected in text messages, B.M. met with defendant to buy cocaine. (PSR ¶ 10; Plea Ag. ¶ 19.) When they arrived at his house, defendant told B.M. that he did not have cocaine, but as illustrated in the text messages, B.M. affirmatively believed that the line of white powder defendant gave her ten minutes later was, in fact, cocaine. (PSR ¶ 14; Plea Ag. ¶ 19; Ex. 2 at USAO_OLIVA_002606.) Defendant, as he has admitted, knew that the white powder was fentanyl but did not tell B.M.; rather, he claimed to police that he told her it was "some other stuff." (PSR ¶ 37; Plea Ag. ¶ 19.) B.M.'s contemporaneous text messages show, however, that she thought the line was cocaine.

1  (PSR ¶ 15; Plea Ag. ¶ 19 ("He just gave me a line and I don't think
2  it's coke"; "I thought it was coke bit [sic] it's not.").)  Upon
3  taking the drug--which, as described by defendant, she divided into
4  two lines and snorted while he watched--B.M. immediately recognized
5  it as more powerful than she had expected, texting: "I thinks [sic]
6  he just drugged me with something bad."  (PSR ¶ 15; Plea Ag. ¶ 19.)
7  The only plausible inference from these communications is that,
8  although defendant first told B.M. he did not have cocaine, he then
9  took it back and represented that the line he was giving her was, in
10 fact, cocaine.  There is no other reason B.M. would expect cocaine
11 after defendant told her that he did not have any.  B.M.'s reaction
12 after she took the drug—where she immediately recognized the
13 substance defendant gave her as "something bad" that she did not
14 intend to take--confirms the inference. (PSR ¶ 15; Plea Ag. ¶ 19.)

15      Thus, defendant's misinformation deprived B.M. of the ability
16 to make an informed choice about the substance she was consuming.
17 Of the two persons in the room, only defendant knew that what he
18 gave her was fentanyl and he did not tell her, instead leading her
19 to believe it was cocaine after all.  That misinformation caused
20 B.M.'s death.  Indeed, the Sentencing Commission amended the
21 Guidelines to address circumstances exactly like these.  See USSG
22 App. C, amendment 807 (Reason for Amendment) (2018) ("Because of
23 fentanyl's extreme potency, the risk of overdose death is great,
24 particularly when the user is inexperienced or unaware of what
25 substance he or she is using.") (emphasis added.)  Under these
26 circumstances, the four-level increase for administering fentanyl
27 but misrepresenting the nature of the substance applies.
28 Defendant's total offense level is thus 43.

Even if the Court declines to apply this enhancement, the Court should depart upward an equivalent amount under 18 U.S.C. § 3553(a) because defendant's knowing misrepresentation was deadly and is significantly aggravating.

As the PSR concludes, defendant does not have recorded criminal convictions and is therefore in criminal history category I. (PSR ¶ 61.) His guidelines range as calculated by the USPO is 262 to 327 months, with a mandatory-minimum term of five years of supervised release. (PSR ¶ 103.) With the applicable four-level increase for misrepresenting fentanyl as another substance, defendant's total offense level is 43 and his guidelines range is life in prison. USSG Sentencing Table, Ch. 5, Pt. A.

**IV. GOVERNMENT'S SENTENCING RECOMMENDATION**

The government recommends a sentence of 420 months' imprisonment, followed by a mandatory term of five years' supervised release, and a $200 mandatory special assessment. This case concerns loss of life under tragic circumstances involving abominable offense conduct. A 420-month sentence is the minimum that will account for defendant's conduct in the commission of these offenses, including his predatory conduct in driving the victim to his home against her wishes and expectations, giving her a fatal quantity of fentanyl under the guise that it was another drug, raping her when she was unconscious or dead, sharing the rape video on social media, and spending hours hiding evidence while he did nothing to help, or honor, the victim who lay dead or dying in his apartment, where she had not wanted to go in the first place. See 18 U.S.C. § 3553(a)(1), (2)(A)-(C).

1      The seriousness of the offense conduct is self-evident.  See 18

2   U.S.C. § 3553(a)(1), (2)(A).  Defendant distributed a substance that

3   caused the victim's death.  Distribution resulting in death carries

4   a 20-year statutory mandatory minimum sentence even absent any

5   aggravating factors.  See United States v. Houston, 406 F.3d 1121,

6   1124 (9th Cir. 2005) ("[A]s long as death 'results' from the use of

7   a described controlled substance, the person convicted of

8   distributing the substance' shall be sentenced to a term of

9   imprisonment of not less than twenty years or more than life.'")

10  (quoting 21 U.S.C. § 841(a)(1)(b)(1)(C)).  The guidelines are in

11  accord, providing for a base offense level of 38 before any

12  additional enhancements where distribution results in death or

13  serious bodily injury.  USSG § 2D1.1(a)(2).  One of the purposes of

14  such a serious penalty is to deter drug dealers from distributing

15  drugs that could kill people and to recognize the loss of life that

16  results from such wanton distribution.  Here, the loss of B.M.'s

17  life is shocking and irreversible.  The pain of that loss for her

18  family continues, as evidenced in their eloquent and powerful

19  letters to the Court.  (See Ex. 6.)[7]

20      Defendant's conduct--even measured against the backdrop of

21  criminal penalties for distribution resulting in death--is simply in

22  another league of depravity and callous self-interest that merits a

23  correspondingly serious sentence.  See 18 U.S.C. § 3553(a)(1),

24  (a)(2)(A)-(C).  This is so for several reasons and can perhaps be

25  best understood by looking at a chronology of his choices.

---

[7] Exhibit 6 is a true and correct copy of letters from B.M.'s family
that were provided to the USPO. (See PSR ¶¶ 25-30.)

First, defendant acted as a predator even at the outset of his encounter with B.M.  He picked her up on false pretenses, claiming that he had cocaine when he did not and claiming that he would take her to Hollywood when he had no intention of doing so.  (PSR ¶¶ 11-14; Plea Ag. ¶ 19.)  He took her to his house instead of to meet her friend, as he had promised.  (PSR ¶ 14; Plea Ag. ¶ 19.)  And he told her friend to lie about whether they were meeting up.  (Ex. 3 at USAO_OLIVA_002607.)  Even before he gave B.M. the drug, she was afraid, she wanted to leave, and she believed defendant was not going to let her leave.  (PSR ¶¶ 11-14; Plea Ag. ¶ 19.)

Then, defendant knowingly gave her fentanyl without telling her what it was and under circumstances that led her to believe that it was cocaine.  (PSR ¶¶ 15, 37; Plea Ag. ¶ 19.)  He gave her a quantity sufficient to divide into two lines, and he watched her snort it.  (Ex. 4 at USAO_OLIVA_000035.)

He then took advantage of her incapacitation, raping her dead or unconscious body.  (PSR ¶ 16; see also Plea Ag. ¶ 19.)  He did not use protection.  (PSR ¶ 16.)  He filmed the rape.  (Id.)  He shared the video online.  (Id.)

By no later than 2:22 am, defendant knew that B.M. was "not breathing."  (PSR ¶ 17; Plea Ag. ¶ 19.)  He left her "not breathing" on his bed while he covered up his own criminal tracks. (PSR ¶¶ 17-21; Plea Ag. ¶ 19.)

We will never know whether B.M. was merely unconscious at the time of the rape and could have been resuscitated.  Defendant made it impossible to know.  He was the only one who was present; he was the only one who saw when she was not breathing; and he was the only one who could have acted, yet he did nothing for her.  Instead, he

gathered evidence of his illegal conduct and hid it in his girlfriend's car, and then he hid the car. (PSR ¶ 14; Plea Ag. ¶ 19.) He hid not only evidence of his own drug trafficking, he hid evidence of B.M.'s possessions and identity, including her purse and her cell-phone. (Ex. 4 at USAO_OLIVA_000035-37.) Later, even though defendant had access to her driver's license, officers used the internet to try to find B.M.'s workplace to learn B.M.'s full name. (Ex. 4 at USAO_OLIVA_000027.) Defendant was sitting on that information. It was in the trunk of his girlfriend's car where he put her purse and cell phone after he knowingly gave her the drug that caused her death. He lied about all of it to protect himself.

When police arrived, defendant's conduct was no better. Defendant lied extensively and repeatedly to police. Defendant lied about the drugs, including saying B.M. had brought her own. (PSR ¶¶ 32, 34.) Defendant lied about the sex, claiming to have had consensual sex with B.M. in multiple positions, listing them at nauseating length, claiming that B.M. was "into it" and that she was "moaning" and "moving around." (PSR ¶ 35; Ex. 4 at USAO_OLIVA_000026-27.) Defendant lied about the evidence, claiming that he drove his brother's truck, did not have his girlfriend's car keys, and was holding drugs for a friend, among other things. (PSR ¶¶ 32-39.)

Given a few days to reflect following arrest, defendant dug deeper, directing his girlfriend to destroy evidence of his own criminal conduct. (PSR ¶ 24; Plea Ag. ¶ 19.)

At decision after decision, defendant made choices that further harmed the victim and frustrated the investigation in an attempt to help, or gratify, himself. Defendant's deliberate, predatory, self-

serving, and remorseless behavior demonstrates his significant
danger to the community, the need for deterrence, to promote respect
for the law, and to provide just punishment, and merits a sentence
of 420 months.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

There are no mitigating factors that counsel for a lower
sentence.  In particular, any argument premised on defendant's lack
of criminal history should be disregarded.  Defendant's criminal
history score is contemplated in his guidelines range, which because
of the serious nature of his conduct, is life imprisonment.
Further, a lack of criminal <u>history</u> does not necessarily signify a
lack of criminal <u>conduct</u>.  Here, Defendant was a known source of
cocaine to M.B. (<u>See</u> PSR ¶ 10; Plea Ag. ¶ 19.)  Defendant's pay/owe
sheets indicate that he had regular customers and that he knew
street prices and street language for drugs.  (Ex. 5.)  The ledger
shows more than 20 transactions in February leading up to B.M.'s
death.  (<u>Id.</u>)  Further, defendant was not only a drug dealer, he was
armed for that purpose.  As defendant admitted in his plea
agreement, he carried the firearm found in the trunk of the Camry in
furtherance of his drug trafficking.  (Plea Ag. ¶ 19.)

Defendant was a drug dealer, and he made a living that way.  In
his interview with USPO, defendant claimed to have been employed by
his brother from 2018 on, yet he "could not recall the name of the
company."  (PSR ¶ 93.)  The contention, like so many of defendant's
statements, is simply a cover for misconduct.  Defendant made a
living by selling drugs.

There is also no plausible argument that defendant's abhorrent
conduct was aberrational or solely in response to the exigency of
B.M.'s death.  To be sure, the circumstances were extreme.  A woman

1    died in his residence.  But as noted, even before that happened,

2    defendant's conduct revealed a predatory and prevaricating nature.

3    He lied about having cocaine.  He took B.M. to his house against her

4    wishes and expectations.  Once there, he offered her a line that she

5    expected would be cocaine, but which defendant alone knew was

6    fentanyl.  All of this preceded any arguable response to exigency.

7    This was the conduct that brought the victim within his reach.

8        Once B.M. passed out or died, defendant then made a series of

9    decisions that demonstrate an alarming defect in both decision-

10   making and empathy and cannot be plausibly characterized as a

11   response to the exigency of unexpected death.  It is not a plausible

12   response to exigency to rape an unconscious woman.  It not a

13   plausible response to exigency to post vides of the rape to

14   Snapchat.  It is not a plausible response to exigency to send a

15   cover-up text to your victim's friend, asking with light-hearted

16   pretense "she is not breathing . . . does she do this often[?]"

17   Likewise, exigency does not excuse ignoring a dead or dying person

18   in your bedroom for six hours while you cover your tracks.  Exigency

19   does not excuse using your girlfriend's car to hide the evidence of

20   your criminal conduct.  Exigency by no means excuses bragging to law

21   enforcement about the positions you used when you slept with the

22   woman you raped as she was incapacitated.  Exigency does not excuse

23   soliciting your girlfriend to destroy evidence six days later.

24       All of this conduct, from B.M.'s death to the jailhouse call to

25   his girlfriend, took place over days.  Defendant's lies to law

26   enforcement took place across four interviews spanning hours.

27   Defendant subsided in his lies only when confronted with

28   contradictory evidence.  As just one example of his brazen

willingness to lie to cover his tracks, he told police that he did not have the car keys that were in his pocket as he was speaking.

As Maya Angelou said, "When someone shows you who they are, believe them."  The events here provide telling insight into defendant's character.  He lied to get B.M. to his apartment; he lied about the drugs that caused her death; he violated her dead or unconscious body; and he left her, dead or dying for six hours. Compounding these indignities and disgraceful choices, defendant then lied to cover his tracks.  Defendant has shown who he is through choice after choice after choice.  Nothing less than a 420-month sentence is appropriate here.

**V.   CONCLUSION**

As set forth above, the government recommends that the Court sentence defendant to 420 months' imprisonment, a five-year term of supervised release, and a mandatory special assessment of $200.